## TWIN CITY BUILDING & LOAN ASSOCIATION v. SARAH M. JOHNSON.[1]

March 15, 1935.

No. 30,137.

[1]Reported in 259 N. W. 551.

*Stinchfield, Mackall, Crounse, McNally & Moore,* for appellant.
*G. H. Smith* and *V. J. Hermel,* for respondent.

HILTON, JUSTICE.

Action for specific performance of a contract for the exchange of real estate. The answer set forth claimed false and fraudulent representations on the part of agents of plaintiff relative to the rental income of the property she received in the exchange. The court made findings of fact which did not sustain the defense of fraud, but as a conclusion of law held that it would be inequitable specifically to enforce the contract between the parties. This appeal is from an order denying plaintiff's motion to amend the findings of fact, conclusions of law, and order for judgment, or, in the alternative, for a new trial. The question presented is whether it was an abuse of judicial discretion to refuse to grant specific performance.

Defendant, desiring to sell or exchange a bungalow which she owned in Edina, a suburb of Minneapolis, consulted Thorpe Bros., real estate agents, with reference thereto. One of their agents, Maginnis, had a list of properties which plaintiff had for sale, including a triplex (five years old) in Columbia Heights, Minnesota. Representing Thorpe Bros., Maginnis acted as an intermediary in the negotiations which followed between plaintiff and defendant. Defendant also discussed the matter with one Youngquist, sales manager of plaintiff. The negotiations resulted in the execution of the contract for exchange of the two properties (earnest money contract) on May 17, 1933. By its terms defendant agreed to purchase the triplex for $9,001, of which one dollar was paid in cash; the sum of $4,000 was to be paid by conveyance by defendant to plaintiff of the bungalow; the balance of $5,000 was to be covered by a contract for deed payable at the rate of $45 per month, which

payment was to include interest. The contract further provided that defendant should be entitled to possession of the triplex upon the delivery of the instrument of conveyance of the bungalow. It also contained other provisions customarily found in agreements of that character. On May 31, 1933, the contract for deed to the triplex was executed by the parties, and on June 10 defendant went into possession thereof. On June 14, 1933, plaintiff sold under binding contract for deed the bungalow property to one Lundahl and wife, and on June 15, 1933, defendant turned over possession thereof to plaintiff. On July 15, 1933, defendant vacated the triplex and refused to accept the contract for deed to the triplex and refused to give a deed to the bungalow as provided for in the contract for exchange.

The views of the trial court are expressed in its memorandum, and we quote the whole thereof:

"While the defendant makes against the plaintiff a charge of fraud, it is very likely that the evidence fails to substantiate such a charge. But the evidence does amply show the entire absence of equity in the plaintiff. She was not advised that Thorpe Brothers were agents for both herself and the plaintiff, and she was not advised that she should have advice in the matter, before she had closed the deal, though such advice was given after the deal had been closed, to the extent that she had the title examined. [It was found perfect.] It is undoubtedly true that while she was discussing the matter and making her computations as to income and outgo, she must have believed, and it must have been apparent to the party with whom she dealt that she did believe, that she would get the amount of rents upon which she was basing her calculations, and it is equally true that he did not disabuse her mind of that idea. It is significant, too, that while the plaintiff made an offer originally of $4,800 for its property in addition to defendant's property, when she made a counter-offer of less than the offer of plaintiff, after consultation between plaintiff and its agent, who was also acting as agent for the defendant, plaintiff raised its price $400 and finally made the deal for $200 more than its original offer.

4

"If specific performance is decreed, it seems quite likely that the defendant will have parted with her own property (which in this deal was valued at $4,000, although almost immediately thereafter sold by the plaintiff for $2,300) and likewise lose the property that she undertook to purchase from the plaintiff. It seems, as indicated in the findings, that those considerations indicate that there is not only no equity in the plaintiff, but that the court would abuse its discretion if it undertook to order specific performance."

The evidence is conclusive that defendant knew that Thorpe Bros., through Maginnis, represented plaintiff and also represented her. She had listed her property with them; Maginnis had shown her various other properties previous to the triplex here involved. The contract for exchange expressly named plaintiff as the vendor "by Thorpe Bros., his duly authorized agent," and was signed "Thorpe Bros., as agent, by H. Maginnis." It was also signed by defendant as vendee. On the same date, May 17, 1933, plaintiff ratified the agreement of sale in writing and in it stated: "Pending the closing of said sale, the earnest money shall be held by the above named agent."

The court's conclusion, expressed in its memorandum, that there was an entire absence of equity in the plaintiff, was undoubtedly based upon its finding of fact that: "It appears quite conclusive that in the state of defendant's finances she will not be able to carry out the terms of her contract for deed, and that the income from said property will not be sufficient to make the payments provided for." That finding is an unwarranted assumption that the rents from the triplex would not carry the expenses thereon; neither the finding nor the conclusion is justified by the evidence and both are contrary to the following finding of fact:

"It appears from the evidence that the defendant understood, at the time the transaction was made, that the property would bring in twenty-five dollars per month for the third floor and forty-five dollars per month each for the first and second floors. It appears from the evidence that in truth and fact the rentals were twenty-five dollars per month for the third floor, forty-five dollars per

month during the winter months for the second floor and thirty-five dollars per month for it during the summer months and forty dollars per month during the winter months for the first floor and thirty dollars per month during the summer months, while the second floor rental was further reduced ten dollars per month by an allowance in that sum to the tenant for caring for the premises."

The figures as found by the court actually to exist show that the three apartments had an average monthly rental value of $100, amounting to an annual income of $1,200. The payments on the contract for deed aggregate $540 annually; the taxes were $268, making a total of $808, leaving a balance of $392 for necessary expenses. Defendant testified that in the first conversation she had with Maginnis he told her the rentals were $45 each for the first and second floors and $25 for the third; that later she went with him out to the premises and at that time he told her the rentals were then $70 for the two lower floors ($35 each) and $25 for the third floor. This latter conversation took place sometime around the middle of May, and undoubtedly the summer rates were then in effect. Defendant testified that in determining whether or not the income from the property would carry the expense she based her computations upon a monthly income of $95 (the summer rental value). The first floor was vacant at the time the contract here involved was executed. Defendant from her own examination of the premises was aware of that fact before entering into the transaction. After taking possession of the triplex she moved into the apartment on the first floor. The occupancy thereof by herself has of course no bearing on the rental value of the premises. After defendant vacated the premises the plaintiff took charge thereof and operated it and collected the rents for the benefit of the defendant. At the time of the trial (November 1, 1933) and for a month or two prior thereto, all three of the apartments were rented, bringing in $25 for the third floor, $45 for the second floor, with an allowance of $10 for the care of the premises, and $40 for the first floor.

The only discrepancy in the rentals between what plaintiff's agents are claimed to have represented to defendant and what she learned after taking possession is the reduction of $10 allowed the

6

second-floor tenant for taking care of the premises. She found this out the third day of her occupancy. Defendant was not a novice in the real estate business. She was the owner of considerable other rental properties in Minneapolis. She testified that she was a woman of considerable business experience, had engaged in real estate transactions quite frequently and was familiar with them, and knew what she was doing in connection with such transactions, and, further, that she had dealt in real estate for the last 30 years, was familiar with rentals, able to judge what places rented for, and that she would not make a deal relying on any salesman's opinion without exercising her own judgment. It must have been obvious to a person of her experience that a three-apartment building would require the services of someone to tend the heating plant and perform other odd jobs incidental to the operation of such building. The above facts clearly establish the immateriality of the court's finding that: "It does not appear that she was advised that the rents would in fact carry the payoff on the contract, neither was she advised that such payments would not so carry it."

The significance given by the court to the circumstance that the original offer of plaintiff was raised $400 and then reduced $200 is not warranted. The record shows that the original figure was the tentative offer of the agent, which was not approved by plaintiff. Several offers and counteroffers were made before the amount of $5,000 was finally agreed upon.

The conclusion of the court expressed in the last paragraph of its memorandum, hereinbefore quoted, is manifestly erroneous and has no support in the evidence. In addition to the income she would derive from the triplex here involved, she received rental from four bungalows aggregating $132.50 a month; one of these was unencumbered and rented for $45 a month. In addition, she held a mortgage of $3,500 on a duplex which she had previously sold and had taken the mortgage as part of the purchase price. At the time of the trial the mortgage was being foreclosed, and she expected again to be the owner of it in three months from that time. When asked whether she could easily raise money on her other properties

to carry out the terms of the contract here involved, she answered, "I am not going to," and also said, "I could if I wanted to."

The granting or denying of specific enforcement of a contract rests in the sound discretion of the trial court. The discretion exercised, however, must be judicial discretion, not arbitrary or capricious.

"If the contract has been entered into by a competent party, and is unobjectionable in its nature and circumstances, specific performance is as much a matter of course, and therefore of right, as are damages." Abbott v. Moldestad, 74 Minn. 293, 299, 77 N. W. 227, 228, 73 A. S. R. 348.

In Abernethy v. Halk, 139 Minn. 252, 256, 166 N. W. 218, 220, it is stated:

"It is true enough that a court of equity may decline to enforce an unconscionable contract. But a defense on that score must be based upon allegations of facts and not upon conclusions."

Or, as said in Bredesen v. Nickolay, 147 Minn. 304, 305, 180 N. W. 547:

"Specific performance of a contract to convey real estate is not a matter of absolute right. If enforcement would be unconscionable or inequitable, performance will not be decreed. Or if the contract as written is the result of mistake so fundamental that the minds of the parties have never met, or if an unconscionable advantage has been gained by mistake or misapprehension of the party defendant, and the parties can be restored to their original status, a court administering equity will not enforce the contract."

There are numerous other cases of this court stating the rule substantially as above. We deem it unnecessary to cite or discuss them. There is nothing in the evidence in the instant case that would justify a denial of specific performance under the principles above quoted. The enforcement of the contract certainly would not be unconscionable or inequitable, nor is there any showing that the contract was entered into under such circumstances as would warrant the denial of specific performance. It is manifest that the

8

trial court, exercising a judicial discretion, should have granted specific performance of the contract of exchange.

The trial court is directed to amend its findings and conclusions of law to conform to the views herein expressed and to order judgment in favor of plaintiff.

Reversed.

